**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **REBEKAH SHERRILL,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **V.** | § | |
| | § | **CIVIL ACTION NO. 20-1475** |
| **S&D CARWASH MANAGEMENT, LLC** | § | |
| **d/b/a QUICK QUACK CAR WASH, and** | § | **(Jury)** |
| **JMT SPINDRIFT PARTNERS, LLC d/b/a** | § | |
| **QUICK QUACK CAR WASH,** | § | |
| | § | |
| *Defendants.* | § | |

**PLAINTIFF REBEKAH SHERRILL'S ORIGINAL COMPLAINT AND JURY DEMAND**

Plaintiff Rebekah Sherrill ("Ms. Sherrill"), by and through her undersigned counsel, files this Original Complaint and Jury Demand against Defendants S&D Carwash Management, LLC, d/b/a Quick Quack Car Wash ("Management"), and JMT Spindrift Partners, LLC, d/b/a Quick Quack Car Wash ("Spindrift," and, together with Management, "Quick Quack" or "Defendants"), and would respectfully show the following:

## I.   INTRODUCTION

1.      This is a claim for employment discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Texas Commission on Human Rights Act, Texas Labor Code § 21.001 *et seq.* (the "TCHRA").

2.      In September 2017, Quick Quack extended a job offer to Ms. Sherrill to work as Regional Project Coordinator at its location in Houston, Texas.   Her offer letter stated that she would be employed by two Quick Quack entities, Management and Spindrift, each of which utilized the trade name "Quick Quack Car Wash."   Each entity paid approximately 50% of her salary.   Ms. Sherrill reported directly to Todd Kimball, a Regional Development Partner in

1

Houston for Quick Quack and owner of Spindrift, and also reported to Todd Kimball's brother, Travis Kimball, Chief Marketing Officer of Quick Quack.

3.      Shortly after Ms. Sherrill's employment began, she became the subject of repeated unwanted sexual advances from Todd Kimball.    In addition, the corporate culture in the Houston office where she worked included a pervasive atmosphere of lewd jokes, foul language, and sexually charged discussions amongst the male employees.

4.      Ms. Sherrill refused the sexual advances from Todd Kimball and told him directly that she wanted him to stop, but he did not.    Ms. Sherrill also repeatedly reported her concerns regarding the language used by the male employees to Quick Quack management in Houston, including specific complaints of a "locker-room atmosphere."    Management laughed at her and stated they "liked it that way."

5.      In February of 2018, after Ms. Sherrill repeatedly rebuffed Todd Kimball's sexual advances and repeatedly complained of the hostile work environment in the Houston office, Todd Kimball hired another employee, a male, to perform her job duties.    Todd Kimball informed Ms. Sherrill that the new employee needed the job more than she did because he was a man and had a family to support.

6.      In April of 2018, Ms. Sherrill reported her concerns regarding sexual harassment, hostile work environment, and sex-based discrimination to the Quick Quack Human Resources department.    The Human Resources department did not take her concerns seriously.    Instead, Quick Quack retaliated Ms. Sherril by terminating her within 4 weeks of her initial complaint to the Human Resources department.

7.     Title VII and the TCHRA make it unlawful to discriminate against employees because of their sex.   In addition, it is illegal to retaliate against an employee for engaging in a protected activity with respect to Title VII and the TCHRA.

## II.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because this suit arises under federal law, specifically, Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17.

9.     Venue is proper in this jurisdiction district under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 because Defendants maintain offices in this district, conduct business in this district, and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practices were committed in this district.

10.     Plaintiff has exhausted her administrative remedies and complied with all statutory prerequisites to her Title VII and TCHRA claims.   Plaintiff filed charges of gender discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission ("TWC") against both Defendants on November 2, 2018.   By notices dated January 23, 2020 and received on January 27 and 29, 2020, the EEOC issued a Notice of Right to Sue *(Issued on Request)* with respect to each charge.   This Original Complaint is made within ninety days of receipt of the Notices of Right to Sue.

## III.     PARTIES

11.     Plaintiff Rebekah Sherrill is a 32-year-old female with permanent residency in Houston, Texas, who worked for Defendants from September 2017 until May 2018.   Ms. Sherrill has a Bachelor of Science Degree from Brigham Young University, a Master of Business

Administration from University of Phoenix, and is a Real Estate Sales Agent previously licensed by the Texas Real Estate Commission.

12.     Defendant S&D Carwash Management, LLC d/b/a Quick Quack Car Wash ("Management") is a Delaware limited liability company with its principal office location in Roseville, California.   S&D Carwash Management, LLC may be served with process by serving its registered agent in Texas, CT Corporation System, at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

13.     Defendant JMT Spindrift Partners, LLC d/b/a Quick Quack Car Wash is a Texas limited liability company and affiliate of Management with its principal office location in Houston, Texas.   JMT Spindrift Partners, LLC may be served with process by serving its registered agent, Todd Kimball, at 14814 Cypress Green Drive, Cypress, Texas 77429, or wherever he may be found.

## IV.   FACTS

### A. Management and Spindrift Operated as Plaintiff's Single Employer

14.     Upon information and belief, Quick Quack is a private company headquartered in Roseville, California which owns and operates over 100 car wash locations in Utah, Texas, California, Arizona, and Colorado.   The owners of Quick Quack own and operate several different companies which utilize the assumed name "Quick Quack Car Wash."   The various entities nevertheless represent a single, integrated enterprise, and therefore a single employer for purposes of meeting the defined term "employer" as used in Title VII and the TCHRA.   Quick Quack employs approximately 800 employees. Quick Quack is engaged in an industry affecting commerce and has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

4

15.     Management operates as the corporate headquarters for Spindrift and all Quick Quack Car Wash companies.   Management utilizes and controls local companies such as Spindrift to manage and operate Quick Quack car washes in different parts of the country.   Management is directly involved in Spindrift's daily decisions relating to management and operation of Quick Quack car washes in the Houston area, including opening new car washes, training employees who work at the car washes, and advertising for the car washes. The three owners of Spindrift use the same email addresses as employees of Management, and Spindrift relies on Management for Human Resources support and onboarding. Management controls Spindrift's employment decisions, as evidenced by the fact that Management and Spindrift jointly hire and fire employees such as Plaintiff.   Thus, Management and Spindrift are essentially one and the same, both operating under the name "Quick Quack Car Wash."

16.     Ms. Sherrill met Todd Kimball and Jason Beckstead, Quick Quack partners, through her church in Houston, Texas.   When Todd Kimball and Beckstead learned of her work experience, they asked her to interview for and subsequently offered her a job as a Regional Project Coordinator for the development of the Houston Region working for Quick Quack Car Wash in September 2017.   She was offered a compensation package including $52,500 in base salary plus various perks and benefits.   When Ms. Sherrill received the offer letter, it stated that she would be employed by and receive wages and benefits from both Spindrift and Management.

17.     Ms. Sherrill was informed that she would report directly to Todd Kimball, one of the three "partners" at the location where she worked in Houston, and also reported to his brother, Travis Kimball, Chief Marketing Officer for Management.   The other local "partners" located in Houston were Beckstead and Dave Edwards.   The partners also operated at least one other business, known as Spindrift Transportation d/b/a Matson Logistics, at the same location where

Ms. Sherrill worked.

18.     There were at least 20 employees at the location where Ms. Sherrill worked in Houston, all of whom were male except for Ms. Sherrill and one other female employee. Although several of these employees were technically employed by different entities, those entities were inextricably intertwined in that they operated in the same office space, utilizing the same resources and being managed, owned, and financially controlled by the same partners managing Spindrift.   From time to time, Ms. Sherrill traveled to the corporate headquarters in California and to other Quick Quack regional locations in Utah and Texas for training and project meetings.

**B.   Plaintiff was Subjected to Sexual Harassment and Discrimination**

19.     On Ms. Sherrill's first day of employment, Todd Kimball and Beckstead informed her that while the rest of the employees worked on an open sales floor, they would convert a file room into an office for her because the men working on the sales floor used vulgar and crude language that she would find offensive.   Nevertheless, Ms. Sherrill was repeatedly exposed to the inappropriate and humiliating language used in the office.   As described in Ms. Sherrill's words:

> In addition to the constant barrage of curse words, sexual innuendos were described in detail and women were debased, girlfriends, wives, mothers, virgins, by explicitly described sexual acts. Derogatory remarks of women were commonly uttered. In the normal course of conversation, base name calling and erotica gossip was freely expressed.   At first I regularly petitioned Todd and Jason to discontinue or decrease the behavior; however, I eventually stopped as it became clear nothing would change.

20.     In addition, Ms. Sherrill was subjected to frequent sexual advances, touching, and other sex-based harassment by Todd Kimball.   The examples are numerous.   He discussed with her that he wanted to buy a house together and fantasized about a sexual relationship with her.   He also said that he fantasized about her being pregnant, being a member of his family, and using his last name.   He wanted her to have an "open" relationship with him and his wife.   He physically

6

grabbed her, tried to touch her underwear, smelled her hair, and licked her cell phone.   He talked about Ms. Sherrill's clothing, her weight, her chest size, and her hormonal cycle.   He often talked about her underwear and brought up a website on the computer in an attempt to buy her underwear. He also talked about buying her feminine hygiene products.   He insisted that she work late in the office alone with him.   He also insisted that she go on personal outings with him and that their "friendship" was important to her keeping her job and furthering her career.

21.     Ms. Sherrill was subjected to further sex-based discrimination from Jason Beckstead, who repeatedly asked her about her dating life and asked why she was not married. He told her she should have children and, because she was not married, told her that she should adopt children or raise foster children.   He carried on discussions regarding sexual acts and relationships.   He told her that she should be looking for a man to marry at her age and felt that her priorities were not straight.   Beckstead also told her that women were too expensive and too much work.

22.     Ms. Sherrill asked Todd Kimball and Beckstead on multiple occasions to change both their behavior and the culture of the open sales floor, but nothing changed.    It was clear that they did not take her concerns seriously.    In addition, Todd Kimball continued to repeatedly insist that Ms. Sherrill work late night hours at the office when only the two of them were present.   Ms. Sherrill oftentimes would comply with Todd Kimball's request to work late hours, in which instances the two of them were the only ones in the office.    As Todd Kimball's sexual advances toward her escalated, however, Ms. Sherrill began avoiding or refusing to work late-night hours and instead came to the office early in order to avoid having to be alone with Todd Kimball.

23.     Todd Kimball became frustrated by Ms. Sherrill and hired a male, Jason Godfrey, for her same position in February of 2018.   Ms. Sherrill's job duties included identifying and

purchasing real property on behalf of Quick Quack for new car wash locations.   One must have a real estate license in order to access the Multiple Listing Service database, access properties for sale, and represent a client in a real estate transaction.   Jason Godfrey was less qualified for the position than Ms. Sherrill in part because he did not have a real estate license.   Nevertheless, Godfrey was given a desk in Ms. Sherrill's office and her job duties were transitioned to him. Rather than give Ms. Sherrill new or different job duties, Quick Quack reduced Ms. Sherrill's workload and began transitioning it to Godfrey.

24.     On February 22, 2018, Ms. Sherrill complained to Todd Kimball that she was concerned that Godfrey had been hired to replace her.   Todd Kimball confirmed that Godfrey was hired because her "demeanor had changed."   In addition, he felt that Godfrey needed the job more than her because he was a man and had a family to support.

25.     On April 5, 2018, Ms. Sherrill contacted the Quick Quack Human Resources Department by email requesting assistance.   On April 9, 2018, Ms. Sherrill had a conversation with Kenny Williams, the Human Resources Director for Quick Quack, in which she complained of sex discrimination, harassment, and retaliation.   Williams informed her that he did not believe she was being subjected to sexual harassment and further, that she would no longer be an employee of Management in a month.   Williams then reported Ms. Sherrill's concerns to the local partners, Todd Kimball, Beckstead and Edwards.

26.     After the three partners in Houston were made aware of Ms. Sherrill's complaint to Human Resources, Beckstead became angry with Ms. Sherrill and yelled at her on multiple occasions for going to Human Resources.   In addition, Todd Kimball held a meeting with Ms. Sherrill on April 19, 2018, in which she again brought up her concerns regarding sexual harassment and discrimination, but he either fell asleep or pretended to be asleep.   In clear violation of and

disregard for Quick Quack's own policies, including the Employee Grievance and Open Door Policy, Standards of Conduct, Prohibited Harassment Policy, and Whistleblower Protection Policy, neither Williams, Beckstead, nor Todd Kimball took any steps to address the concerns raised by Ms. Sherrill.

27.     Later in April of 2018, Ms. Sherrill attempted to follow-up with the Human Resources Director, Williams, but he did not respond to her emails or phone calls.   He did, however, pass on her messages to the partners in Houston, who scheduled a meeting with Ms. Sherrill on April 23, 2018 under the guise of wanting to address the concerns she raised with Williams.   In that meeting, Ms. Sherrill again raised her concerns regarding sex-based discrimination and sexual harassment.   Todd Kimball, Beckstead, and Edwards did not address her concerns.   Instead, they informed her that they felt she was having performance issues.

28.     On May 4, 2018, less than 4 weeks after her initial complaint to Human Resources, and less than 2 weeks after her in-person complaint to the local partners, Ms. Sherrill received an email from Todd Kimball stating that she was terminated and asking her to sign a severance agreement waiving her rights that same day.   She did not agree to sign the severance agreement.

29.     In a phone call of May 7, 2018 involving Todd Kimball, Beckstead, and Williams as representatives of Quick Quack, Todd Kimball confirmed that Ms. Sherrill's termination was not-for-cause.   However, in follow-up communications from the Defendants, Defendants have shifted their story to say that Ms. Sherrill was terminated for "failure to perform in line with expectations, her constant insubordination, and persistent unapproved absences."

30.      The discriminatory conduct of which Ms. Sherrill complains in this action includes *quid pro quo* sexual harassment, hostile work environment, sex-based discrimination, and retaliation, all in violation of Title VII and the TCHRA.   The discriminatory acts occurred from September 2017 until May 2018.

## V.      CAUSES OF ACTION

### Count One: Quid Pro Quo Sexual Harassment
### (Violation of Title VII and the TCHRA)

31.      Ms. Sherrill realleges and incorporates herein by reference the foregoing paragraphs.

32.      Ms. Sherrill filed a timely charge of sex discrimination with the EEOC and the TWC and has satisfied all conditions precedent to bringing this action.   Ms. Sherrill exhausted her administrative remedies and timely files this suit following notice of her right to sue.

33.      At all relevant times, both Defendants have been, and continue to be, employers within the meaning of Title VII and the TCHRA.   At all relevant times, Defendants have been engaged in interstate commerce within the meaning of Title VII, and have employed, and continue to employ, 15 or more employees.

34.      Plaintiff was an employee of the company.   Ms. Sherrill was a documented employee of Defendants.

35.      The alleged harasser, an officer or employee of the company, made unwanted sexual advance to plaintiff or engaged in other unwanted verbal or physical conduct of a sexual nature.   The harasser in this situation was Todd Kimball, owner of Spindrift and Regional Development Partner for Management.   Todd Kimball made unwanted sexual advances toward Ms. Sherrill and engaged in other unwanted verbal and physical conduct of a sexual nature.

36.      Certain job benefits were conditioned, by words or conduct, on Plaintiff's

acceptance of the alleged harasser's sexual advances or conduct; or employment decisions affecting Plaintiff were made based on her acceptance or rejection of the alleged conduct.   Todd Kimball directly informed Ms. Sherrill that it was important for her to be his "friend" in order to continue her advancement at the company.   He also informed her that she was required to attend family outings with him in order to keep her job.   When she rejected his conduct, another employee was hired to replace Ms. Sherrill and then she was subsequently counseled for alleged performance issues and terminated.

37.     At the time of the alleged conduct, the alleged harasser was a supervisor or agent for the company.   Todd Kimball was a partner and manager at the company in which Ms. Sherrill worked.   Ms. Sherrill had a direct reporting relationship to Todd Kimball and also reported to his brother, Travis Kimball, Chief Marketing Officer for Management.

38.     Plaintiff was harmed by the alleged conduct.   Ms. Sherrill lost her job and her livelihood because of the conduct of Todd Kimball.   It should be further noted that Spindrift has admitted to this harm and blamed Ms. Sherrill for the loss of her employment due to a change in attitude that hindered her job performance.   After losing her job, Ms. Sherrill suffered additional retaliation and stigma in her church community.

39.     The alleged harasser's conduct was a substantial factor in causing Plaintiff's harm. Ms. Sherrill's rejection of Todd Kimball's advances was a substantial factor in her termination. In fact, Todd Kimball hired her replacement, Jason Godfrey, in an effort to get her to quit.   Todd Kimball explained to Ms. Sherrill that he hired Godfrey because her "demeanor had changed." The reality is that she rejected his sexual advances and stopped working late hours at the office alone with him, which he deemed a change in her "demeanor."

11

40.     Defendants' discriminatory conduct, in violation of Title VII, has caused Plaintiff to suffer a loss of pay, benefits, and prestige.

41.     Defendants' actions have caused Plaintiff to suffer mental and emotional distress, entitling her to compensatory damages pursuant to Title VII and the TCHRA.

42.     Defendants have engaged in discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to Title VII and the TCHRA.

### Count Two: Hostile Work Environment
### (Violation of Title VII and TCHRA)

43.     Ms. Sherrill realleges and incorporates herein by reference the foregoing paragraphs.

44.     Ms. Sherrill filed a timely charge of sex discrimination with the EEOC and the TWC and has satisfied all conditions precedent to bringing this action.   Ms. Sherrill exhausted her administrative remedies and timely files this suit following notice of her right to sue.

45.     Plaintiff belongs to a protected group.   Ms. Sherrill is a woman.

46.     Plaintiff was subject to unwelcome harassment.   At the location where Ms. Sherrill worked in Houston, there were approximately 20 employees, all of whom were men except for Ms. Sherrill and one other employee.   When Ms. Sherrill was hired, she was provided with an office and told that was an attempt to segregate her from the offensive language used by the men working in the open work spaces.   However, just having an office did not insulate her from all such offensive conduct.   The office culture was pervasive with discussions of lewd sexual acts and derogatory remarks toward women.   In addition, Ms. Sherrill was subjected to frequent sexual advances, touching, and other sex-based harassment by Todd Kimball.

47.     The harassment was based on Plaintiff's membership in a protected group.   The frequent offensive comments about women and sexual acts made by Ms. Sherrill's co-workers were clearly offensive to women.   The harassment by Todd Kimball was based on his desire to have a sexual relationship with her.

48.     The harassment was sufficiently pervasive to effect a term, condition, or privilege of employment.   Defendants cannot claim that the conduct Ms. Sherrill experienced constitutes mere isolated comments.   On the contrary, the conduct was so pervasive that it occurred every day and was perpetrated by multiple employees and managers.   Todd Kimball, owner of Spindrift and Regional Development Partner for Management, made unwanted sexual advances toward Ms. Sherrill and engaged in other unwanted verbal and physical conduct of a sexual nature.   Todd Kimball directly informed Ms. Sherrill that it was important for her to be his "friend" in order to continue her advancement at the company.   He also informed her that she was required to attend family outings with him in order to keep her job.   When she rejected his conduct, another employee was hired to replace Ms. Sherrill and then she was subsequently counseled for alleged performance issues and terminated.

49.     Defendants knew or should have known about the harassment, but failed to take prompt, corrective action.   Ms. Sherrill complained of multiple and various sexual harassment and discrimination issues to local management at Spindrift in Houston.   The local management in Houston was fully aware of the problematic culture in their offices and was also explicitly made aware of the fact that it created a hostile work environment for women like Ms. Sherrill.   In addition, Ms. Sherrill complained to the Human Resources Director, Kenny Williams, of "sexism and retaliation" and a "locker room environment."   At that point, Williams should have launched an investigation, but failed do to so.   Human Resources subsequently ignored Ms. Sherrill's

follow-up calls and emails and later complained that it was not aware of her other complaints.    In this case, Williams, as the experienced HR professional, should have recognized Ms. Sherrill's complaint for what it was and investigated further.    Instead, because Williams disagreed with Ms. Sherrill, failed to take prompt, corrective action, and refused to follow-up on further communications from Ms. Sherrill, Defendants cannot now complain that they were not aware of her complaints.

50.    Defendants' discriminatory conduct, in violation of Title VII, has caused Plaintiff to suffer a loss of pay, benefits, and prestige.    Although Plaintiff has diligently sought other employment, Plaintiff not been able to secure permanent employment with comparable pay and benefits.

51.    Defendants' actions have caused Plaintiff to suffer mental and emotional distress, entitling her to compensatory damages pursuant to Title VII and the TCHRA.

52.    Defendants have engaged in discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to Title VII and the TCHRA.

### Count Three: Sex-Based Discrimination
**(Violation of Title VII and TCHRA)**

53.    Ms. Sherrill realleges and incorporates herein by reference the foregoing paragraphs.

54.     Ms. Sherrill filed a timely charge of sex discrimination with the EEOC and the TWC and has satisfied all preconditions to bringing this action.   Ms. Sherrill exhausted her administrative remedies and timely files this suit following notice of her right to sue.

55.     Ms. Sherrill experienced sex-based discrimination when Spindrift hired Jason Godfrey to replace her, hoping that she would quit her job.   Jason Godfrey was hired on February 28, 2018.   The elements of a prima facie case are discussed below.

56.     Plaintiff is in a protected class.   Ms. Sherrill is a woman.

57.     Plaintiff was qualified for the job or performing the job adequately.   Ms. Sherrill has an MBA and her real estate license and was meeting all of the expectations of her employer. In fact, she was more qualified than Jason Godfrey in part because he did not have his real estate license when he was hired and was told he would need to get it.   Furthermore, when Jason Godfrey was hired, Ms. Sherrill discussed with Todd Kimball her concern that Godfrey was hired to replace her.   Todd Kimball confirmed her suspicions and informed Ms. Sherrill that he hired Godfrey because her "demeanor had changed," not because there was a problem with her job performance.   What he *meant* was that she had stopped working late nights at the office alone with him and complained too much about the hostile environment of the office.   Ms. Sherrill was never made aware of any alleged concerns with her job performance until after she complained to Human Resources and to Spindrift.

58.     Plaintiff was subjected to an adverse employment action.     When Jason Godfrey was hired, Quick Quack hoped that she would voluntarily resign.   Williams stated as much in a conversation with Ms. Sherrill.   The situation she was in amounts to constructive termination because it was clear from the circumstances and from the statements made by Todd Kimball that Godfrey was hired to replace her.   For instance, while Ms. Sherrill previously had an office, when

15

Godfrey started, he was assigned to work in Ms. Sherrill's office and was hired to perform her exact job duties, which were transitioned away from Ms. Sherrill to Godfrey, thereby rendering Ms. Sherrill's position obsolete.   Ms. Sherrill was further informed by management that Godfrey needed the job more than she did because he was a man and had a family. When Ms. Sherrill failed to resign, Quick Quack further took adverse employment action by terminating her.

59.     Plaintiff gave better treatment to a similarly-situated person outside the Plaintiff's protected class.   In this case, a man was hired to replace Ms. Sherrill and she was informed of such.   He took over her office, her job duties, and her job title.

60.     Defendants' discriminatory conduct, in violation of Title VII, has caused Plaintiff to suffer a loss of pay, benefits, and prestige. Although Plaintiff has diligently sought other employment, Plaintiff not been able to secure permanent employment with comparable pay and benefits.

61.     Defendants' actions have caused Plaintiff to suffer mental and emotional distress, entitling her to compensatory damages pursuant to Title VII and the TCHRA.

62.     Defendants have engaged in discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to Title VII and the TCHRA.

### Count Four: Retaliation
### (Violation of Title VII and TCHRA)

63.     Ms. Sherrill realleges and incorporates herein by reference the foregoing paragraphs.

64.     Ms. Sherrill filed a timely charge of sex discrimination with the EEOC and has satisfied all preconditions to bringing this action.   Ms. Sherrill exhausted her administrative remedies and timely files this suit following notice of her right to sue.

65.     Following Ms. Sherrill's multiple complaints, Defendants retaliated against her by hiring a man to replace her in the hopes that she would quit.   After she complained about that conduct to Human Resources and to her local managers, Ms. Sherrill was terminated.

66.     Plaintiff participated in a protected activity.   As discussed at length above, Ms. Sherrill complained to Human Resources of sexual harassment, hostile work environment, and sex-based discrimination.   In addition, Ms. Sherrill complained multiple times to local management at Spindrift in Houston.

67.     An adverse action was taken by Defendants against Plaintiff.   After Ms. Sherrill's complaints to the Spindrift partners, they hired Jason Godfrey to replace her.   Ms. Sherrill had a teleconference with the Human Resources Department on April 9, 2018 in which she registered her sexual discrimination complaint.   Ms. Sherrill was then terminated from her position with both companies simultaneously on May 4, 2018.

68.     A causal connection between the protected activity and the adverse action.   On April 23, 2018, Todd Kimball, Beckstead, and Edwards met with Ms. Sherrill under the guise of wanting to address the complaints made to Williams about Jason Godfrey.   However, in that meeting, Todd Kimball, Beckstead, and Edwards, for the first time, brought up their alleged concerns regarding with Ms. Sherrill's performance.   Prior to this date, Ms. Sherrill had not been made aware of any concerns regarding her performance and she was not provided with any concrete information regarding their concerns.

69.     When Ms. Sherrill subsequently asked Human Resources for a resolution to her complaints, Kenny Williams asked her if she would quit if there was no resolution and whether she would take a severance agreement.   Ms. Sherrill told him that she did not wish to quit her job and that she wanted a resolution to her complaints.   However, it was clear from those statements

17

that Quick Quack had no intention of rectifying the sexual harassment or addressing the sexual discrimination she complained of.   It simply wanted her to quit.

70.     Quick Quack's intent was confirmed on May 4, 2018, nine business days later, when Ms. Sherrill was terminated and delivered a severance agreement.   Quick Quack later sought to justify Ms. Sherrill's termination by stating that Ms. Sherrill's demeanor and working relationships within the company and development team had become adversarial.   Ms. Sherrill's complaints to Todd Kimball about the hostile work environment and rejection of his sexual advances were deemed a change in her "demeanor" as Todd Kimball told her directly, and then her further complaints to Human Resources regarding her working environment and sex-based discrimination were deemed "adversarial" and she was therefore terminated.

71.     Defendants' discriminatory conduct, in violation of Title VII, has caused Plaintiff to suffer a loss of pay, benefits, and prestige.   Although Plaintiff has diligently sought other employment, Plaintiff not been able to secure permanent employment with comparable pay and benefits.

72.     Defendants' actions have caused Plaintiff to suffer mental and emotional distress, entitling her to compensatory damages pursuant to Title VII and the TCHRA.

73.     Defendants have engaged in discriminatory practices with malice and reckless indifference to Plaintiff's federally protected rights, thereby entitling her to punitive damages pursuant to Title VII and the TCHRA.

## VI.     EXEMPLARY DAMAGES

74.     Plaintiff is entitled to exemplary damages under Title VII and the TCHRA because Defendants acted with malice or reckless indifference, in that Defendants knew that their actions toward Plaintiff were unlawful, and yet took discriminatory, retaliatory, and adverse employment

actions against Plaintiff with malice or reckless indifference to Plaintiff's rights under Title VII and the TCHRA.

## VII.    ATTORNEYS' FEES

75.    Ms. Sherrill is entitled to recovery her attorneys' fees and costs, including reasonable expert fees, pursuant to Title VII and the TCHRA.

## VIII.    DEMAND FOR JURY TRIAL

76.    Plaintiff Rebekah Sherrill asserts her rights under the Seventh Amendment to the U.S. Constitution and demands, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## IX.    PRAYER

Wherefore, Ms. Sherrill respectfully requests the Court award her the following relief:

a.    reinstatement of Ms. Sherrill's employment;

b.    full front pay;

c.    full back pay;

d.    compensatory damages for the humiliation, emotional distress, and other damages caused by Defendants' conduct;

e.    punitive damages for Defendants' malicious and recklessly indifferent conduct;

f.    all employment benefits Ms. Sherrill would have enjoyed had she not been discriminated and retaliated against;

g.    expenses for litigation, including but not limited to reasonable attorneys' fees;

h.    prejudgment interest on lost wages and benefits and post-judgment interest on all damages awarded, including attorneys' fees;

i.    costs of suit;

j.    all other relief that Ms. Sherrill may be entitled to under law or at equity, and all other relief that the Court deems just and proper.

Dated: April 24, 2020

Respectfully submitted,

**DAVIS & SANTOS, P.C.**

By:     _/s/ Santos Vargas_
Santos Vargas
Attorney-in-Charge
State Bar No. 24047026
E-mail: _svargas@dslawpc.com_
Karissa Gonzalez
State Bar No. 24042174
E-mail: _kgonzalez@dslawpc.com_
Landon Hankins
State Bar No. 24100924
E-mail: _lhankins@dslawpc.com_
719 S. Flores Street
San Antonio, Texas 78204
Tel:  (210) 853-5882
Fax:  (210) 200-8395

*Attorneys for Plaintiff Rebekah Sherrill*