Case 4:20-cv-01475   Document 70   Filed on 09/15/21 in TXSD   Page 1 of 13

United States District Court
Southern District of Texas
**ENTERED**
September 15, 2021
Nathan Ochsner, Clerk

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| REBEKAH SHERRILL, § <br> § <br> Plaintiff. § <br> § <br> VS. § <br> § <br> S&D CARWASH MANAGEMENT, § <br> LLC D/B/A QUICK QUACK CAR § <br> WASH AND JMT SPENDTHRIFT § <br> PARTNERS, LLC, § <br> § <br> Defendants. § | CIVIL ACTION NO. 4:20-cv-01475 |

## **MEMORANDUM AND RECOMMENDATION**

Before me are two motions: (1) a motion to dismiss or, in the alternative, compel arbitration filed by S&D Carwash Management, LLC, d/b/a Quick Quack Car Wash ("S&D"); and (2) a motion for summary judgment filed by JMT Spendthrift Partners, LLC ("JMT"). Dkts. 50 and 54. After carefully reviewing the parties' arguments and applicable law, and for the reasons discussed below, I recommend that S&D's motion be **GRANTED** in part and **DENIED** in part and JMT's motion be **GRANTED so far as it requests the Court to refer the matter to arbitration**. Specifically, I recommend that all the plaintiff's claims be referred to arbitration and that this matter be stayed pending resolution of the arbitration.

## BACKGROUND

**A.   THE BUSINESS STRUCTURE**

Headquartered in Roseville, California, S&D operates Quick Quack Car Wash ("QQCW") carwashes in five states: Arizona, California, Colorado, Texas, and Utah. It has roughly 1,400 employees. In certain states or markets, S&D partners with various development companies to help identify and develop new

carwash locations, which S&D then manages under the QQCW brand. In addition to an agreed-upon development fee, the development companies also generally receive an ownership interest in each QQCW location they help develop, the percentage of which varies depending on the amount of capital contributed.

JMT[1] is a Texas limited liability company that oversees the development of QQCWs in the greater Houston area. JMT, is comprised of three partners: Todd Kimball, David Edwards, and Jason Beckstead (collectively "JMT Partners"). During the time period relevant to the underlying lawsuit, JMT had two employees.

**B.   THE EMPLOYMENT ARRANGEMENT**

The plaintiff, Rebekah Sherrill ("Sherrill"), was recruited by JMT to work for JMT and S&D in the Houston region. Sherrill's employment arrangement was rather unique. Although hired as JMT's Regional Project Coordinator, Sherrill also served as S&D's part-time "marketing manager" for the Houston region. Even Sherrill's offer letter blurred the lines between the two companies. Indeed, the offer letter was from JMT, on QQCW letterhead, and identified JMT as "d.b.a. Quick Quack Car Wash." Dkt. 57-9 at 1.

Sherrill began working for both entities in September 2017. She executed separate onboarding documents for each position and received separate salaries from her two employers. She performed her duties for both jobs from JMT's office in Houston.

As part of S&D's onboarding process, Sherrill agreed to arbitrate "all claims arising out of or related to [her] employment" with "Quick Quack Car Wash." Dkt. 50–1 at 5. The arbitration agreement does not define "Quick Quack Car Wash," nor does it mention S&D or JMT. The final page of the agreement includes two signature blocks. One for the "Employee" and the other for an "Authorized Representative of Quick Quack Car Wash." Dkt. 50–1 at 6. It is undisputed that

---

[1] JMT was originally formed as a car-wash investment company. However, in 2009, S&D engaged JMT to develop QQCW locations in and around Houston.

Sherrill electronically signed the agreement at the time she completed her other onboarding documents.

Here's where it gets a bit confusing. Both Sherrill and whoever executed the arbitration agreement on behalf of QQCW electronically signed the agreement using an alphanumeric signature,[2] and both signatures begin with the same six digits: 195359. The number is unique to Sherrill—it is her employee number in S&D's payroll system. S&D is unable to explain this oddity and does not claim that any of its employees signed the agreement on QQCW's behalf. Sherrill alleges that JMT's Todd Kimball electronically signed the agreement in front of her at the same time she signed the agreement. JMT does not dispute this allegation, though it does not confirm it either.

### C. THE ALLEGED HARASSMENT

Sherrill alleges that she immediately became the subject of repeated and unwanted sexual advances and inappropriate conduct from her direct supervisor, Todd Kimball. Since neither defendant seeks dismissal on the merits, a full recitation of Sherrill's allegations is neither required nor necessary to resolve the pending motions. However, to add context to the parties' respective arguments, it is relevant to mention that the complained-of harassment involved either JMT Partners or employees of a JMT-affiliated company that operated out of the same office space (Spendthrift Transportation d/b/a Matson Logistics) and do not directly implicate any S&D employee.

## PROCEDURAL HISTORY

Sherrill's employment with JMT and S&D ended in April 2018.

On April 20, 2020, Sherrill sent JMT and S&D written requests to participate in arbitration under the terms of her arbitration agreement. JMT refused, claiming that it was not a party to the arbitration agreement and did not

---

[2] An alphanumeric signature consists of both letters, numbers, and often other symbols (e.g., punctuation marks or mathematical symbols).

satisfy the minimum-employee threshold to be held liable under federal or state law.

On April 24, 2020, Sherrill concurrently filed the underlying complaint, as well as a formal demand for arbitration with the American Arbitration Association ("AAA"). In this Court, Sherrill asserts claims against JMT and S&D under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Texas Commission on Human Rights Act ("TCHRA"), TEX. LAB. CODE § 21.001 *et seq.*, for: (1) sex-based discrimination; (2) sexual harassment; (3) retaliation; and (4) hostile work environment.

Sherrill refused S&D's request to stay the underlying proceedings in favor of her arbitration demand, contending that the arbitration agreement does not define "Quick Quack Car Wash" and, therefore, does not apply to her claims against either S&D or JMT.

On February 11, 2021, S&D filed the instant motion to dismiss or, in the alternative, compel arbitration. *See* Dkt. 50. S&D seeks dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(3), arguing that either Sherrill lacks standing or federal court is the improper forum to resolve her dispute. In its meandering motion, S&D avers that Sherrill is judicially estopped from proceeding in federal court—and therefore lacks standing—because her complaint expressly alleges that JMT, S&D, and QQCW are unified for purposes of liability.

On February 24, 2021, JMT moved for summary judgment. *See* Dkt. 54. JMT argues summary judgment is appropriate because it does not meet the minimum-employee threshold to qualify as an "employer" for purposes of Title VII or the TCHRA. JMT also responds to Sherrill's pleaded theory that JMT and S&D are a "single, integrated enterprise"—which, if true, would allow Sherrill to aggregate JMT's and S&D's employees—JMT argues that the two companies lack nearly all the tell-tale signs courts look for when determining whether to apply the integrated-enterprise theory. Namely, JMT argues there is insufficient evidence of

4

an interrelation of operations (business or financial) between the two entities and absolutely no overlap in ownership or management.

Sherrill's joint response to both motions primarily aims to undermine JMT's integrated-enterprise argument. *See* Dkt. 57 at 27–40. On that front, she highlights, among other things, that: (1) JMT exclusively develops QQCW carwashes; (2) JMT does not have its own website or e-mail address domain; (3) the JMT Partners have QQCW e-mail addresses and business cards; (4) JMT signs contracts and other legal documents for QQCW on S&D's behalf; and (5) her offer letter was on QQCW letterhead. In response to S&D's arguments, Sherrill contends that S&D cannot demand arbitration under the agreement because "neither S&D nor JMT is identified in the arbitration agreement, and the agreement does not define 'Quick Quack Car Wash.'" *Id.* at 42.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") requires the Court to enforce an arbitration agreement in the same manner that it would enforce any other contract. *See* 9 U.S.C. §§ 1–16; *Specialty Healthcare Mgmt., Inc., v. St. Mary Par. Hosp.*, 220 F.3d 650, 654 (5th Cir. 2000). Specifically, the FAA provides that:

> A party aggrieved by the alleged failure . . . of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction . . . for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.

When adjudicating a motion to compel arbitration, the Court is directed to engage in a two-step analysis. *See Wash. Mut. Fin. Grp., LLC v. Bailey*, 364 F.3d 260, 263 (5th Cir. 2004). The first step is to determine whether the parties agreed to arbitrate the dispute at issue. *See Klein v. Nabors Drilling USA L.P.*, 710 F.3d 234, 236 (5th Cir. 2013). This determination is guided by two questions: (1) is there a valid agreement to arbitrate the claims; and (2) does the dispute in question fall within the scope of that arbitration agreement. *See id*. In light of the strong federal

5

policy favoring arbitration, the Supreme Court has instructed that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). This presumption does not apply, however, to the determination of whether a valid agreement to arbitrate exists between the parties. Instead, ordinary state-law contract principles govern the Court's analysis. *See Klein*, 710 F.3d at 237.

The Fifth Circuit "has not articulated precisely what quantum of evidence is necessary to prove or disprove the existence of an agreement to arbitrate" under the first step. *Gallagher v. Vokey*, No. 20-11000, 2021 WL 2772825, at *2 (5th Cir. July 1, 2021). *See also Jackson v. Royal Caribbean Cruises, Ltd.*, 389 F. Supp. 3d 431, 443 (N.D. Tex. 2019) ("The Fifth Circuit has never discussed the appropriate standard for a district court to apply when considering a motion to stay or compel arbitration" (cleaned up)). But it has explained that "[t]he party resisting arbitration bears the burden of showing that he is entitled to a jury trial under § 4 of the Arbitration Act." *Dillard v. Merrill Lynch, Pierce, Fenner & Smith*, Inc., 961 F.2d 1148, 1154 (5th Cir. 1992) (quotation omitted). Further, "the party must make at least some showing that under prevailing law, he would be relieved of his contractual obligation to arbitrate if his allegations proved to be true" and "he must produce at least some evidence to substantiate his factual allegations." *Id*. "To put the making of the arbitration agreement in issue, [a party] is required to unequivocally deny that he agreed to arbitrate and produce some evidence supporting his position." *Chester v. DirecTV, LLC*, 607 F. App'x 362, 363–64 (5th Cir. 2015) (cleaned up). Although the "some-evidence" standard may appear similar to Rule 56's evidentiary standard for summary judgments, the Fifth Circuit has not decided whether the 9 U.S.C. § 4[3] standard applied by district courts in this

---

[3] A court may not compel arbitration under the FAA until it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C § 4.

6

Circuit is congruent with the Rule 56's evidentiary standard. *See Gallagher*, 2021 WL 2772825, at *2. It is sufficient that, "where competent evidence showing the formation of an agreement to arbitrate has been presented, § 4 requires a party resisting arbitration to produce *some* contrary evidence to put the matter 'in issue.'" *Id*.

## ANALYSIS

A.  **A VALID AGREEMENT TO ARBITRATE EXISTS.**

The initial question of whether a valid agreement to arbitrate exists usually concerns matters of contract formation. *See, e.g., Sherer v. Green Tree Servicing LLC*, 548 F.3d 379, 381 (5th Cir. 2008) (addressing whether a valid arbitration agreement existed between a party to the agreement and a nonsignatory).

Here, there is no question that Sherrill and "Quick Quack Car Wash" agreed to arbitrate "all claims arising out of or related to [her] employment . . . including unlawful harassment or discrimination." Dkt. 50-1 at 5. In fact, Sherrill does not dispute that she agreed to arbitrate claims arising out of or related to her employment with QQCW. *See* Dkt. 57 at 25 ("Plaintiff does not dispute that she signed an arbitration agreement or filed a demand in AAA; the question is with whom in light of JMT's ongoing objection on the basis that it is neither a covered employer nor a party to the same agreement."). However, Sherrill contends that she did not agree to arbitrate her claims against JMT or S&D—i.e., that no agreement exists between the parties. *See id*. at 42.

Sherrill's argument on this point is not entirely clear and quickly veers into her primary argument that S&D cannot compel arbitration because a fact question exists as to who signed the arbitration agreement on QQCW's behalf. *See id*. at 43–46.

To determine whether an arbitration agreement is enforceable, courts apply the relevant state-law principles that govern contract formation. *See IMA, Inc. v. Columbia Hosp. Med. City at Dall., Subsidiary L.P.*, 1 F.4th 385, 391 (5th Cir. 2021). Under Texas law, a valid contract consists of: (1) an offer; (2) an acceptance;

(3) meeting of the minds; (4) the consent of each party to the terms of the agreement; (5) execution and delivery of the contract with the intent that the agreement be mutual and binding; and (6) consideration. *See Song v. 4170 & 4231 & 4271 Altoona Drive Holdings Ltd. P'ship*, 616 F. App'x 645, 648 (5th Cir. 2015).

I briefly address Sherrill's argument that she only agreed to arbitrate claims arising out of or related to her employment with QQCW. First and foremost, QQCW is not a legal entity; it's a brand name, S&D's d/b/a, and the title Sherril uses in *her* complaint to describe S&D. *See* Dkt. 1 at 4 ("Defendant S&D Carwash Management, LLC d/b/a Quick Quack Car Wash"). Put differently, even if she wanted to, Sherrill could not sue QQCW. *See Kahn v. Imperial Airport, L.P.*, 308 S.W.3d 432, 438 (Tex. App.—Dallas 2010, no pet.) ("A DBA is no more than an assumed or trade name. And it is well-settled that a trade name has no legal existence."). Moreover, Sherrill expressly pleaded that S&D does business as "Quick Quack Car Wash." She cannot now complain that S&D "asks this Court to blindly accept that 'Quick Quack Car Wash' is a DBA that is unique to S&D," simply because it suits her new narrative. Dkt. 57 at 42. *See Zedner v. United States*, 547 U.S. 489, 504 (2006) ("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position." (cleaned up)). So, for her to argue that she only agreed to arbitrate her claims against QQCW is a nonstarter. Moreover, this argument is in stark contrast with the position she takes in her pleadings, which repeatedly treat S&D and JMT as a single entity, operating under the QQCW brand. *See, e.g.,* Dkt. 1 at 1 (denominating S&D and JMT as "Quick Quack" or "Defendants"), 5 ("Thus, [S&D] and [JMT] are essentially one and the same, both operating under the name 'Quick Quack Car Wash.'"). These incongruent positions are impossible to harmonize.

Indeed, Sherrill's entire theory of liability regarding JMT *requires* that JMT and S&D be treated as a single entity. Recall, JMT is not, strictly speaking, an employer for purposes of Title VII or the TCHRA because it does not meet the

8

minimum-employee threshold. When viewed through this lens, Sherrill's true protest becomes apparent—in her mind, arbitration is an all-or-nothing deal. In other words, Sherrill's opposition is to S&D's attempt to divide this case into two forums by seeking to compel arbitration of only those claims she brought against S&D. *See* Dkt. 57 at 26 ("[I]f JMT and S&D are part of a single integrated enterprise, then the arbitration agreement likely covers claims against both entities as Plaintiff's 'employers.' However, in the absence of summary judgment evidence that establishes the exact relationship between JMT and S&D, then genuine issues of material fact persist regarding whether one or both partner entities are subject to an arbitration agreement that [JMT and S&D] dubiously insist they still do not know who signed, and which only names '[QQCW].'" (citation omitted)).

Moving on to whether a valid agreement to arbitrate exists, the agreement itself evinces an offer of an arbitration agreement and Sherrill's acceptance by way of her signature. The delivery and execution of the agreement, combined with Sherrill's completion of her onboarding paperwork and subsequent employment, indicate the parties' intent that the agreement be mutual and binding. Lastly, the agreement is supported by consideration.

Admittedly, the evidence indicates there is a fact question about who signed the arbitration agreement as QQCW's authorized representative. But, as explained here and in the following section, the "who" is not relevant. Indeed, although the FAA provides that courts can only enforce written agreements to arbitrate, 9 U.S.C. § 3, it does not require the written arbitration agreements to be signed to enforce them. *See Valero Refining, Inc. v. M/T Lauberhorn*, 813 F.2d 60, 64 (5th Cir. 1987) (collecting cases); *In re Macy's Tex., Inc.*, 291 S.W.3d 418, 419 (Tex. 2009) (per curiam) ("The FAA contains no requirements for the form or specificity of arbitration agreements except that they be in writing; it does not even require that they be signed."). For example, a plaintiff will be bound by an arbitration agreement by continuing her employment after receiving notice of an arbitration policy. *See In re Dall. Peterbilt, Ltd., L.L.P.*, 196 S.W.3d 161, 162 (Tex. 2006) ("An

9

employer may enforce an arbitration agreement entered into during an at-will employment relationship if the employee received notice of the employer's arbitration policy and accepted it. . . . When determining whether an employee received notice of a binding arbitration agreement, our cases do not confine that 'notice analysis' to the underlying agreement, but to all communications between the employer and employee.").

In sum, it is beyond debate that Sherrill agreed to arbitrate all claims "arising out of or related to [her] employment" with QQCW. Dkt. 50–1 at 5. If her underlying claims do not fall within the ambit of that agreement, I do not know what claim ever would. Accordingly, I find that there is competent evidence showing a valid agreement to arbitrate exists.

**B.     INTERTWINED-CLAIMS ESTOPPEL APPLIES IN THIS CASE.**

Sherrill's chief argument is that S&D cannot compel arbitration because it is not known who signed the arbitration agreement on QQCW's behalf. However, even assuming JMT signed the agreement, a nonsignatory to an arbitration agreement may compel a party to arbitrate a claim "if the relevant state contract law so permits." *Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 261–62 (5th Cir. 2014).

Intertwined-claims estoppel involves "compelling arbitration when a nonsignatory defendant has a close relationship with one of the signatories and the claims are intimately founded in and intertwined with the underlying contract obligations." *Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 610 (5th Cir. 2016) (cleaned up). It applies when there is a "tight relatedness of the parties, contracts, and controversies." *Id.* (quotation omitted).

To date, the Texas Supreme Court has not officially recognized intertwined-claims estoppel, and the Texas courts of appeals are split on the question. *Id.* at 610. However, the Fifth Circuit in *Hays* made an "*Erie* guess" that, "if faced with the question," the Texas Supreme Court would adopt intertwined-claims estoppel. *Id.* at 610–12.

10

Here, Sherrill treats JMT and S&D as a single unit in her pleadings, particularly in her complaint. *See* Dkt. 1. *See also* Dkt. 57. Indeed, Sherrill alleges the same causes of action and claims the same damages against both defendants. Further, there is an indisputably "tight relatedness of the parties, contract[], and controversies." *Hays*, 838 F.3d at 610. Therefore, I conclude that S&D's motion to compel arbitration must be granted even if S&D was not a signatory to the agreement based on intertwined-claims estoppel.

### C.   JMT AGREED TO ARBITRATE SHERRILL'S CLAIMS AGAINST IT, AS WELL.

JMT asks the Court to dismiss Sherrill's claims because it is not an "employer" for Title VII purposes. Dkt. 54 at 21. It further argues that it cannot be considered an employer under the theory that JMT and S&D are a single, integrated enterprise. *Id.* at 21–40.

Questions about whether JMT is an "employer" or whether JMT and S&D are a single, integrated enterprise go toward the merits of JMT's defense and, thus, are questions for the arbitrator to decide. *See Int'l Bhd. of Elec. Workers, Local 2188 v. W. Elec. Co.*, 661 F.2d 514, 517 (5th Cir. 1981) ("[T]he merits are for the arbitrator, not the court, to decide."); *Meridian v. Algernon Blair, Inc.*, 721 F.2d 525, 528 (5th Cir. 1983) ("The court's sole function is to determine whether the claim is referable to arbitration. Once that determination is made, the court may not delve further into the dispute.").

I have already determined that a valid agreement to arbitrate exists—an agreement in which Sherrill agreed to arbitrate all claims arising out of or related to her employment with QQCW "including but not limited to, claims of unlawful harassment or discrimination." Dkt. 50–1 at 5. Once again, if the claims at issue in this case do not "aris[e] out of or relate[] to" Sherrill's employment with QQCW, then I do not know what claims ever would. *Id.* Accordingly, I find that Sherrill's

claims against JMT fall within the scope of the arbitration agreement and must, therefore, be arbitrated in accordance with the terms of that agreement.[4]

## CONCLUSION

For the reasons explained above, S&D's motion to dismiss or, in the alternative, compel arbitration is **GRANTED** in part and **DENIED** in part; and JMT's motion for summary judgment is **GRANTED so far as it requests the Court to refer the matter to arbitration**. Specifically, I recommend that the Court deny S&D's motion to dismiss, refer all Sherrill's claims against both S&D and JMT to arbitration, and stay the case pending resolution of the arbitration.

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have 14 days from receipt to file written objections under Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure

---

[4] In its summary judgment motion, JMT argues that the Court should refer Sherrill's claims against him to arbitration if it does not dismiss them outright. *See* Dkt. 54 at 41. As it stands, S&D has moved to compel arbitration of the claims against it in accordance with the arbitration agreement. The agreement governs Sherrill's employment with QQCW. There is no bright-line answer as to whether JMT and S&D are a single, integrated enterprise for purposes of aggregating their employees, thereby subjecting JMT to liability under Title VII or the TCHRA. However, I believe there is a bright-line answer to the question of whether JMT is considered part of QQCW for purposes of the arbitration agreement. The evidence plainly shows that JMT repeatedly held itself out as a QQCW affiliate. For example, Sherrill's offer letter was on QQCW letterhead and identified JMT as "d.b.a. Quick Quack Car Wash." Days after receiving the offer letter, Sherrill agreed to arbitrate all claims related to her employment with QQCW. Further, the evidence all but proves Todd Kimball was the only individual who could have signed the arbitration agreement as QQCW's "authorized representative," and JMT's silence on the issue speaks volumes. The JMT Partners also had QQCW business cards and e-mail addresses. Even the signature block for e-mails sent by the JMT Partners from their QQCW addresses read: Quick Quack Car Wash / 888-772-2792 / DontDriveDirty.com. *See, e.g.*, Dkt. 57–33. "888" is not a Houston area code; instead, the number directs you to QQCW's Customer Care Department. Given the above, there is no doubt in my mind that the arbitration agreement covers Sherrill's claims against both S&D and JMT. Accordingly, arbitration is the proper forum to resolve JMT's merits-based arguments. *See Dunn Constr. Co. v. Sugar Beach Condo. Ass'n*, 760 F. Supp. 1479, 1482 (S.D. Ala. 1991) ("The district court's ultimate objective in reviewing a motion to compel arbitration is to ascertain if an arbitrable dispute exists between individuals or entities who may be compelled to arbitrate. If arbitration is appropriate, it then is the arbitrator's responsibility to resolve the merits of the parties' contentions.").

to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

Signed on this 15th day of September 2021.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE